IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| KEYONTAE J. LEGETTE, ) | CASE NO. 5:20-CV-2709 |
| ) | |
| Plaintiff, ) | JUDGE DAVID A. RUIZ |
| ) | |
| vs. ) | |
| ) | MAGISTRATE JUDGE |
| ) | JONATHAN D. GREENBERG |
| ) | |
| COMMISSIONER OF SOCIAL ) | |
| SECURITY, ) | **REPORT & RECOMMENDATION** |
| ) | |
| Defendant. | |

Plaintiff, Keyontae Legette ("Plaintiff" or "Legette"), challenges the final decision of Defendant, Kilolo Kijakazi,[1] Commissioner of Social Security ("Commissioner"), denying his application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, and 1381 *et seq.* ("Act"). This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation. For the reasons set forth below, the undersigned recommends that the Commissioner's final decision be AFFIRMED.

## I. PROCEDURAL HISTORY

In August 2017, Legette filed an application for SSI alleging a disability onset date of August 4, 2017 and claiming he was disabled due to attention deficit hyperactivity disorder ("ADHD"), mental conditions, and anxiety. Transcript ("Tr.") at 219, 249. The application was denied initially and upon reconsideration, and Legette requested a hearing before an administrative law judge ("ALJ"). Tr. 133.

On January 21, 2020, an ALJ held a hearing, during which Legette, represented by counsel, and an impartial vocational expert ("VE") testified. Tr. 29-52. On January 27, 2020, the ALJ issued a written

---
[1] On July 9, 2021, Kilolo Kijakazi became the Acting Commissioner of Social Security.

1

decision finding that Legette was not disabled. Tr. 15-24. The ALJ's decision became final on October 6, 2020, when the Appeals Council declined further review. Tr. 1-3.

On December 4, 2020, Legette filed his Complaint to challenge the Commissioner's final decision. Doc. No. 1. The parties have completed briefing in this case. Doc. Nos. 13, 15, 16. Legette asserts the following assignment of error:

> At step five, the ALJ found that Mr. Legette is capable of performing a significant number of jobs. This finding is unsupported by substantial evidence because the ALJ's residual functional capacity finding does not include the specific limitations found in the persuasive opinion of the consultative examiner, Dr. Ickes.

Doc. No. 13, p. 1.

## II. EVIDENCE

**A.**     **Personal and Vocational Evidence**

Legette was born in 1994 and was 23 years-old on the date the application was filed. Tr. 23. He had been found eligible for SSI as a child and in March 2013 underwent an age 18 redetermination of disability and was found to be no longer disabled. Tr. 58.

**B.**     **Relevant Medical Evidence[2]**

On February 29, 2016, Legette went to the Counseling Center for a diagnostic assessment in part to obtain needed documentation for a disability claim. Tr. 344, 352. He reported being unable to hold a job due to problems focusing, being unable to work at a fast rate of speed, and back pain. Tr. 344. His symptoms included a depressed and anxious mood, poor impulse control, difficulty sleeping, impaired concentration and memory, suspiciousness, and occasional thoughts of self-harm. Tr. 344. He "can't focus on anything and his mind is everywhere." Tr. 344. Legette was diagnosed with ADHD, depressive disorder, and learning difficulty. Tr. 350.

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

2

On June 23, 2016, Legette had his first counseling session. Tr. 370. He reported that he loses his temper sometimes but also that he gets quiet and others who know him know when he is upset. Tr. 370. He denied getting into trouble over his anger but had recently gotten into trouble after "getting involved" with a 15-year-old who he thought was older. Tr. 370. He makes "a little money selling parts" but can't keep a job because he has trouble concentrating and his back hurts after he stands for a while. Tr. 370. He said he had been diagnosed with ADHD in school and had taken Adderall, but it made him sick so he doesn't want to take it anymore. Tr. 370.

On August 17, 2016, Legette returned to counseling and reported doing his community service at his grandmother's church as part of avoiding a jail sentence and meeting with his probation officer every week. Tr. 374. He hung out with his brothers and cousins, who were supportive of him. Tr. 374. The counselor observed that he was friendly and spoke openly and didn't seem to be having any major problems at the time. Tr. 374. On September 8 he was enjoying working with a friend on trucks, learning a lot, and thinking of going to truck driving school and continuing to repair trucks on the side. Tr. 376. He denied problems other than the fact that being labeled a sex offender was "annoying" because it meant he couldn't go to the fair the next week. Tr. 376. They discussed finding him a counselor who treats sex offenders, as his probation requires, and the counselor observed that Legette was calm while discussing that. Tr. 376.

On October 21, 2016, Legette told his counselor that he was with a friend recently, met a woman, and events that followed led to him being charged with importuning. Tr. 379. The counselor characterized Legette as having an "easy going manner" and that he was "rather naïve and not very knowledgeable about adult issues/responsibilities." Tr. 379. He was still helping a friend sell truck parts for spending money and appeared "stymied regarding investigating employment and/or furthering his education." Tr. 379. On December 9, he reported completing his community service hours at the

3

church, that he was self-employed, and he was "not really interested in a 9 to 5 job, working for someone else at this time." Tr. 382. He had enough money to take care of himself and was planning on attending school online. Tr. 382. His ex-girlfriend was taking care of his car for him and he reported being stable with no major problems or concerns. Tr. 382.

On February 3, 2017, Legette reported that his probation officer wanted him to get a job but he did not want to work. Tr. 386. On March 28, Legette reiterated that his probation officer wanted him to get a job and he was "reluctantly looking for employment." Tr. 389. He talked about wanting to get married, getting his driving privileges reinstated, attending school online, and feeling that if he could stay focused he could get his life on track. Tr. 389. He stated that he had never been a person to get into trouble. Tr. 389. His counselor commented that he appeared inexperienced in life skills and being independent and he showed some immaturity and a lack of understanding about how to make sound decisions and evaluate potential outcomes. Tr. 389. In August, he reported that his probation officer told him that he had to establish employment for at least 30 days. Tr. 394. He planned to achieve that through job and family services. Tr. 394. He denied any problems or concerns. Tr. 394.

On October 13, 2017, Legette saw Curt Ickes, Ph.D., for a psychological evaluation in connection with his disability application. Tr. 415-419. His chief complaint was, "My back is bad and work is hard. I have trouble being around people and I can't get the hang of things. I can't focus." Tr. 415. He last worked in 2017 in a factory for one week as a press operator through a temp agency. Tr. 416. He said that he was terminated or laid off because he couldn't keep up and he argued with the boss. Tr. 416. He stated that in the past he had worked in other factories and as a general laborer but it didn't work out; he was terminated for getting into a fight with someone or not showing up. Tr. 416. He reported being depressed, having crying spells, having anxiety a lot and getting angry a lot, and having problems focusing on things. Tr. 416-417. He took Adderall and started Bupropion a month ago

4

for anger, mood swings and depression; the Adderall worked well but he didn't think the Bupropion was strong enough. Tr. 417. He had been dating his girlfriend for about a year and they fought a lot. Tr. 417. He had completed his court-ordered counseling. Tr. 417. He described a typical day: he lived with his grandmother, got up around 10:00 am, would maybe watch a movie, clean the house a little, and mow the lawn. Tr. 417. He sees his girlfriend every day and he had one other friend. Tr. 417. His grandmother did his shopping for him but he managed his own money. Tr. 417.

Dr. Ickes described Legette as courteous and agreeable with good eye contact and appropriate responses to questions. Tr. 417. His speech and thoughts were normal. Tr. 417. He appeared somewhat depressed, had an appropriate affect, and did not return a smile. Tr. 417. He did not show signs of anxiety. Tr. 418. Dr. Ickes diagnosed ADHD; anxiety disorder; major depressive disorder, recurrent, moderate; and borderline intellectual functioning, and assessed a GAF score of 55.[3] Tr. 418. He opined that Legette is able to understand, carry out, and remember one-step instructions but complex instructions would be more problematic due to low cognitive functioning. Tr. 419. He could complete basic, routine tasks. Tr. 419. "He prefers to work in solitary environments but could engage, at least minimally, with others." Tr. 419. He would be able to perform lower stress work activities "especially in solitary situations, such as landscaping, but, due to limited coping skills, would have problems with high pressure type positions or situations involving a great deal of social contacts." Tr. 419.

On September 28, 2018, Legette saw Dr. Ickes for a second psychological evaluation. Tr. 442-446. When asked why he was applying for disability, Legette cited his back pain and his difficulty learning things and that he still has ADHD. Tr. 442. He reported his last job was in 2017 as a general laborer cleaning out factories. Tr. 442. "At first, it was okay and then it got rough." Tr. 443. He "got

---

[3] GAF (Global Assessment of Functioning) considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses. *See American Psychiatric Association: Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision. Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34. A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. *Id*.

into it with the boss….He was yelling about something and I told him I was leaving, and he just fired me." Tr. 443. The longest he reported working was one month; "It was good, but I got into a fight with a guy and got fired." Tr. 443. At other jobs he was fired because he couldn't keep up. Tr. 443. When asked why he was unable to work, he cited his back pain and inability to get along with others. Tr. 443. When asked about his mental health concerns, he stated that he had mood swings, a lot of anger, and he couldn't focus because of ADHD. Tr. 444. His depression had improved and he needed to control his anger better. Tr. 444. His medication helped a little bit but he often forgot to take it; he took it about three times a week. Tr. 444. He reported having some friends, including one with whom he worked on pickup trucks with as part of his daily schedule. Tr. 444. He had been with his girlfriend for two years; they fought every day and she was living in California. Tr. 444.

 Dr. Ickes described Legette as friendly and cooperative, he maintained eye contact throughout the exam and responded appropriately, and he did not show any unusual behavior or signs of anxiety. Tr. 444. His affect was normal, appropriate, and well-modulated and he "easily returned a smile." Tr. 444. He lacked insight into the reasons for his poor social interactions. Tr. 445. Dr. Ickes diagnosed ADHD; major depressive disorder, recurrent, mild; and borderline intellectual functioning, and assessed a GAF score of 60. Tr. 445. He opined that Legette was able to understand, carry out, and remember one-step instructions but complex instructions would be more challenging. Tr. 446. He would have some difficulties in concentrating and persisting at work related activities at a reasonable pace, especially if the tasks are speeded or involve ongoing focus or decision making; he could perform manual labor-type jobs at a reasonable pace. Tr. 446. "He prefers to work in solitary environments but could engage, at least minimally, with others." Tr. 446. "Employment involving regular contact with the public would be problematic." Tr. 446. Dr. Ickes cited Legette's reports of past conflict with supervisors and coworkers and commented that his social skills were poor. Tr. 446. He would be able

6

to perform "lower stress/routine" work activities "especially if he was working by himself." Tr. 446.

**C.     State Agency Reports**

On October 17, 2017, Patricia Kirwin, Ph.D., reviewed Legette's file and, regarding his RFC, stated that Legette could perform simple repetitive tasks with 1-4 steps and no production quotas or fast pace; could have superficial contact with coworkers and the general public and no resolving conflicts or persuading others to follow demands; and he could complete tasks in an environment in which changes are occasional and explained in advance. Tr. 79-81. On June 25, 2018, Aracelis Rivera, Psy.D., reviewed Legette's file and stated that he had not responded to the agency's attempts to contact him, he did not report current treatment, there was no additional evidence to evaluate his claim, and, as a result, there was insufficient evidence for a full evaluation. Tr. 92.

**D.     Hearing Testimony**

During the January 21, 2020 hearing, Legette testified to the following:

- He lives in a house with his grandmother and his older brother. Tr. 35, 38. He used to have a driver's license but no longer has one. Tr. 34-35. He graduated from high school. Tr. 34. He had been prescribed bupropion for mood swings but he doesn't take it anymore. Tr. 35.

- The last job he had he held for about a month and it ended because he got into an argument with the boss. Tr. 36. When asked if that happened on other jobs he stated, "Not necessarily. The boss, with other people." Tr. 36. When asked if he remembered whether his bupropion helped he stated, "No." Tr. 36. His mood swings come out of nowhere and he gets angry. Tr. 36-37. It takes him 3 days to calm down. Tr. 37.

- When he was younger he took Adderall for his ADHD. Tr. 37. He still has problems with his ADHD at times. Tr. 37. He can't focus, but he feels like it's more of "a hyper thing," an "energy control type of deal." Tr. 37. Adderall helped but it made him sick. Tr. 37-38. He still has problems with depression; he feels like he doesn't really want to do anything. Tr. 38.

- He gets along pretty well with the older brother he lives with. Tr. 38. When asked if he has any friends that he does things with he stated, "No, not necessarily, I just stay in the house." Tr. 38. On a typical day he watches videos on his phone. Tr. 38-39. He does the laundry sometimes. Tr. 39. He does not have a girlfriend or any friends that he sees outside the house. Tr. 39.

7

- When asked what would be the hardest part about having a job, he answered, "Getting along with somebody and people bossing me around." Tr. 41. For example, if he is working he will walk out because he is afraid that he will hurt somebody. Tr. 41. He has not gotten physical with someone at work. Tr. 41. When asked if it's just being around bosses or around people he doesn't know, he stated, "both." Tr. 42. When asked if he felt that way at other places, such as a store, he stated that he did, "and people staring at me and stuff; just being weird." Tr. 42.

- When describing what happened in one job, he stated that he was going to leave, but a family member working with him talked to him and told him he needed to stay. Tr. 42. And then the boss kept screaming at him, so he just walked away. Tr. 42. And then he called off, and they told him to stay home. Tr. 42. When asked if he had difficulty learning that job—cleaning out semi-trailers—he stated that there were a bunch of tools they needed to use and it was a little confusing. Tr. 42. There were guys that showed him how to do it but it was still difficult. Tr. 42-43. He was able to get along with those people showing him how to clean the trailers. Tr. 43. When asked what was problematic about his co-workers, he answered "usually, they'd start on me" and that's what made him angry. Tr. 43. He couldn't explain what they did; "They just make me angry." Tr. 43.

- When asked if he was able to focus and pay attention he answered, "somewhat," and explained that he's "always off doing other things, at times" and that it depends on the job. Tr. 43. He stated that once his boss told him to go to another area to work because another person he was working with was distracting him from getting his work done, but Legette didn't go where the boss told him to go and stayed where he was. Tr. 43. Then, the boss got his boss and that person told him that he has to listen to the person in charge. Tr. 43. He stated that he was late "all the time" because he wasn't paying attention to what time it was. Tr. 43-44. He had similar problems returning to work from breaks. Tr. 44. When asked if he had problems filling out job applications, he stated that he sometimes did but that, in one case, a person in the office helped him complete it. Tr. 44.

- When asked if he had thought about going back to counseling he said no. Tr. 44. When asked why not, he answered that he just sits at home and stays segregated. Tr. 44-45. Counseling "definitely helped a little bit." Tr. 45. He got along with his counselor and, while he didn't like going there, he enjoyed being there and talking to him. Tr. 45.

The ALJ asked the VE whether a hypothetical individual with the same age and education as Legette could perform any work if the individual had the following limitations: can perform simple, routine tasks that do not involve arbitration, negotiation, confrontation, directing the work of others, or being responsible for the safety or welfare of others; no piece rate work or assembly line work; and can occasionally interact with others. Tr. 47-48. The VE testified that such an individual could perform the following representative jobs in the economy: landscape worker, janitor, and laundry worker. Tr. 48.

When asked if his answer would change if the individual could have occasional interaction with supervisors and no interaction with coworkers or the general public, the VE stated that there would be no work for such an individual. Tr. 48-49. When asked if his answer would change if the individual described in the first hypothetical would require frequent redirection from a supervisor in order to stay on task and the redirection would continue for the length of employment, the VE stated that there would be no work for such and individual. Tr. 49. When asked about acceptable off-task behavior, the VE stated that off-task behavior above 10% is unacceptable. Tr. 50. Legette's attorney asked about a typical employer's tolerance of tardiness and the VE answered that tardiness was akin to an absence and that a worker could be absent for no more than one day a month. Tr. 50.

### III. STANDARD FOR DISABILITY

A disabled claimant may be entitled to receive SSI benefits. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981). To receive SSI benefits, a claimant must meet certain income and resource limitations. 20 C.F.R. §§ 416.1100, 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4). *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b) *and* 416.920(b). Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) *and* 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR

9

Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

### IV. SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant has not engaged in substantial gainful activity since August 4, 2017, the application date (20 CFR 416.971 *et seq*.)[].

2. The claimant has the following severe impairments: Attention Deficit Hyperactivity Disorder ("ADHD"), Learning Disability, Depression and Anxiety (20 CFR 416.920(c)).

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: The claimant can perform simple, routine tasks that do not involve arbitration, negotiation or confrontation. The claimant can perform work that is free of directing the work of others or being responsible for the safety or welfare of others. The claimant can perform tasks that are free of piece rate work or assembly line work. The claimant can occasionally interact with others.

5. The claimant has no past relevant work (20 CFR 416.965).

6. The claimant was born on July **, 1994 and was 23 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7. The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

8. Transferability of job skills is not an issue in this case because the claimant does not have past relevant work (20 CFR 416.968).

10

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10. The claimant has not been under a disability, as defined in the Social Security Act, since August 4, 2017, the date the application was filed (20 CFR 416.920(g)).

Tr. 17-24.

## V. STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir.2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law

Judge must stand if the evidence could reasonably support the conclusion reached."). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996)); *accord Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D.Ohio July 9, 2010).

## VI. ANALYSIS

Legette challenges the ALJ's evaluation of the opinion of consultative examiner Dr. Ickes. Doc. No. 13, pp. 9-11. The ALJ discussed Legette's first evaluation with Dr. Ickes in October 2017 and observed that there was no record evidence until his next evaluation with Dr. Ickes in September 2018. Tr. 21. He summarized Dr. Ickes' September 2018 exam findings and wrote,

12

> The psychological consultative examiner opined that the claimant could complete one-step instructions, but complex instructions would be problematic due to low cognitive functioning. The claimant could complete basic routine tasks but tasks requiring ongoing or shifting attention would extremely be challenging. The claimant preferred to work in solitary environments or at least with minimally contact with others. The claimant would be able to perform lower stress work activities in solitary situations. (B5F). I find the opinion regarding the claimant's memory to be unpersuasive as it was unsupported by the examination findings. The claimant recalled three of three items on the delayed recall task and recalled seven digits on the digit span task. The claimant was an accurate historian. It was also inconsistent with the claimant's daily activities as the claimant reported that he was able to manage his own funds. I find the balance of the opinion to be persuasive as it was supported by the examination findings. The claimant could not complete the serial sevens task. He reported that he was irritable with others and had difficulty interacting with supervisors. The claimant also reported poor reactions to stress. (B5F; B6F; B7F).

Tr. 21-22.

Legette concedes that the ALJ provided sufficient reasons for rejecting Dr. Ickes' opinion pertaining to Legette's memory issues. Doc. No. 13, p. 11. But, he argues, despite the ALJ finding that the balance of Dr. Ickes' opinion was persuasive, the ALJ failed to account for Legette's limitations in social interaction and adaption in his RFC finding or explain why he left those limitations out. Doc. No. 13, p. 10 (citing SSR 96-8P, 1996 WL 374 184, at *7); Doc. No. 16, p. 1. He complains that the ALJ's RFC "does not incorporate Dr. Ickes' opinion that Mr. Legette prefers to work in a solitary environment or at least with minimal contact with others or that Mr. Legette would be able to perform low stress work activities in a solitary situation." Doc. No. 13, p. 10. Defendant counters that the ALJ's RFC assessment is consistent with Dr. Ickes' opinion. Doc. No. 15, pp. 8-9.

First, Dr. Ickes' statement that Legette "prefers" to work in a solitary environment is not an opinion describing a functional limitation; it is a description of Legette's stated preference. Indeed, Dr. Ickes stated that Legette "could engage, at least minimally, with others." Tr. 446. Because Dr. Ickes did not opine that Legette must work in a solitary environment, the ALJ did not err when he did not include that limitation in his RFC finding or explain why he did not include that limitation.

13

Next, with respect to Dr. Ickes' opinion that Legette could have at least minimal contact with others, the ALJ accounted for that limitation in his RFC finding when he limited Legette to occasional interaction with others and tasks that involve no arbitration, negotiation, confrontation, directing the work of others, or being responsible for the safety or welfare of others. *See*, *e.g.*, *Hall v. Saul*, 2020 WL 2839419, at *15 (N.D. Ohio June 1, 2020) (an opinion that the claimant can have "minimal social interaction with coworkers" is consistent with an RFC limiting the claimant to occasional and superficial interaction with others); *cf. Escobar v. Colvin*, 2014 WL 6982312, at *8 (N.D. Ohio Dec. 9, 2014) ("superficial" interaction means no negotiation, arbitration, confrontation, responsibility for the health and safety of others, or supervision of others). Thus, the undersigned finds that Dr. Ickes' opinion that Legette can have "at least minimal contact with others" is consistent with the social interaction limitations the ALJ included in his RFC assessment. Legette does not cite legal authority or present persuasive argument to the contrary.

Finally, the undersigned finds that the ALJ did not err when he failed to include an RFC limitation restricting Legette to "low stress work activities in a solitary situation," as Legette contends. First, Dr. Ickes did not opine that Legette could perform only low stress work activities in a solitary situation.[4] In his first evaluation, Dr. Ickes opined that Legette could perform "lower stress work activities especially in solitary situations, such as landscaping, but, due to limited coping skills, would have problems with high pressure type positions or situations involving a great deal of social contacts." Tr. 419. The fact that Dr. Ickes believed that Legette would excel when performing low stress work activities in a solitary situation does not equate to a finding that Legette could only perform work in that setting. Dr. Ickes' next statement—that Legette would have problems in high pressure-type positions— creates a middle ground within with Legette could perform work: ideally low stress and solitary but not

---

[4] The ALJ's description of Dr. Ickes' opinion is intended as a summary. The ALJ did not err when his RFC did not include the words he used to summarize Dr. Ickes' opinion, to the extent that is what Legette suggests.

14

high pressure.  The ALJ incorporated Dr. Ickes' opinion in his RFC assessment when he limited Legette to simple, routine tasks with no piece rate or assembly line work.  Legette does not explain why he believes that RFC limitation does not account for Dr. Ickes' opinion that Legette avoid high pressure positions.  And the ALJ's RFC incorporated Dr. Ickes' opinion that Legette could not work "in situations involving a great deal of social contacts" when he limited him to occasional contact with others and no arbitration, negotiation, confrontation, directing the work of others, or being responsible for the safety or welfare of others, as discussed above.

Dr. Ickes' second opinion stated that Legette would be able to perform "lower stress/routine work activities especially if he was working by himself."  Tr. 446.  Here, too, Dr. Ickes does not state that Legette must work by himself, and Legette does not explain why he believes that the ALJ's RFC finding—limiting Legette to simple, routine tasks with no arbitration, negotiation, confrontation, directing the work of others or being responsible for the safety or welfare of others, no piece rate or assembly line work, and occasional interaction with others—is inconsistent with Dr. Ickes' opinion.  It is well-settled that an ALJ is not required to adopt a medical opinion verbatim or adopt the limitations wholesale.  *Reeves v. Comm'r of Soc. Sec.*, 618 Fed. App'x 267, 275 (6th Cir. 2015) (citation omitted).  Moreover, the ALJ also relied on the state agency reviewer's opinion, which Legette does not challenge.  Nor does Legette challenge the ALJ's finding that Legette's statements about the intensity, persistence, and limiting effects of his symptoms were inconsistent with the record because he was found to be cooperative with treatment providers, consultative examiners, and at the hearing; he engaged in romantic relationships and had friends; and he received little treatment for his condition without excuse and he was not compliant with taking his medication.  Tr. 22-23.

In sum, the undersigned finds that the ALJ's RFC finding was consistent with Dr. Ickes' opinion.  Therefore, Legette's argument that the ALJ erred because he did not adopt Dr. Ickes' opinion or explain

15

why he did not adopt his opinion fails.

## VII. CONCLUSION

For the foregoing reasons, the undersigned recommends that the Commissioner's final decision be AFFIRMED.

Date: February 25, 2022
           *s/ Jonathan Greenberg*
           Jonathan D. Greenberg
           United States Magistrate Judge

**OBJECTIONS**
**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.** *See Berkshire v. Beauvais*, **928 F.3d 520, 530-531 (6th Cir. 2019).**